UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 17-cr-10098-GAO |
| | ) | |
| BURHAN UD DIN | ) | |

<u>SENTENCING MEMORANDUM OF BURHAN UD DIN</u>

Defendant Burhan Ud Din ("Mr. Din") respectfully requests this Honorable Court impose a sentence of probation for three years with following conditions: five hundred hours of community service; joint and several restitution; and a special assessment of $600.  This sentencing memorandum is submitted in support of that request.

### *Introduction*

Mr. Din is a fifty year-old married father of six children with no prior criminal history. PSR ¶78.  His two oldest children died days after their birth.  *Id.*  He is now the sole provider for his wife, Shazia Din ("Shazia"), and their four living children.  *Id.* at ¶87-89.  His youngest son, nine year-old N.D., was born premature by three months and spent the first one hundred days of his life hospitalized.  *Id.* at ¶79.  To this day, N.D. suffers from epilepsy and seizures requiring near constant attention and care.  *Id.*  Over the last several years Mr. Din has worked hard to support his family as a taxi, Uber, and Lyft driver; these jobs also allow Mr. Din to respond to N.D. when he requires immediate attention or an emergency hospital visit.  *See id.* at ¶87.  Mr. Din's parents passed away in 2016 and 2017, respectively, and all of his siblings live in his native Pakistan or elsewhere abroad.  *Id.* at ¶¶75-77.  Mr. Din's children, particularly N.D., need their father.  *See id*.  Even more, the people who know Mr. Din—his friends, family, neighbors, and religious community members— all speak of his genuinely kind, compassionate, and peaceful nature.  *See* Letters in Support of Burhan Din, attached at Ex. A.

1

The Court is uniquely justified in sentencing Mr. Din to three years probation with conditions of extensive community service and restitution in this case.  Not only is that sentence "sufficient, but not greater than necessary" to meet the goals of sentencing under 18 U.S.C. §3553(a), but it is a sentence appropriately tailored to the circumstances and will actually make the community a better place.  Put simply, Mr. Din is a service-oriented family man with no prior criminal record whose actions at these small fried chicken restaurants have already upended his life.  He carries a heavy burden for what he has brought upon those who rely on him and his adopted country.  His family is angst-ridden about their future and the precarious health of N.D. If ever it was necessary, Mr. Din's case has already served a significant deterrent effect on the dozens of supporters, including many Pakistani-Americans, who attended his trial and support him now; none of his supporters want to face what Mr. Din has now experienced in front of his closest family members and friends.  Along with the deaths of his children and other family crises, this case has been the most challenging experience of Mr. Din's life.

Mr. Din wants to make amends to those who he let down, pay his outstanding debts, and recommit himself to his family, community, and country.  A prison sentence is not only unnecessary to achieve the goals of sentencing, it is counterproductive and an actual risk to his family.  The goals of sentencing in this particular case are best met by a term of probation with extensive community service and restitution.

### *Sentencing Factors*

18 U.S.C. §3553(a) provides as follows:

*The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this section.  The court, in determining the particular sentence to be imposed, shall consider - (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the*

*offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for [the Sentencing Guidelines]; (5) any pertinent policy statements [by the Sentencing Commission]; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.*

### *Mr. Din's Personal History and Characteristics*

People from all walks of life who know Mr. Din speak of his kindness, generosity, humility, and commitment to his family and friends.  Dozens of supporters attended Mr. Din's trial, and dozens support him now, because they know first-hand the love and commitment he routinely provides for others.

### *Mr. Din's Family*

First and foremost is his family.  Mr. Din and his wife, Shazia, married in Pakistan twenty-three years ago in 1996.  *See* PSR ¶78; 84.  After two painful losses of their first two children, they successfully started a family with the birth of their oldest living daughter, Kiran Din ("Kiran").  *Id.*  In 1999, Mr. Din, Shazia, and Kiran emigrated to the United States.  *Id.* at ¶80.  Mr. Din and Shazia are now the parents of four living children, Kiran (21), J.D. (13), A.D. (11), and N.D. (9).  *Id.*

Mr. Din is the sole support for his family, and they completely depend on him financially and emotionally.  *See* PSR ¶78.  Mr. Din's eldest daughter Kiran has written a letter to the Court. *See* Letter of Kiran Din, attached at Ex. A.   Kiran writes, "[my] family's story is typical of immigrants who come to this country seeking a better life.  My father worked and continues to work very hard just so I can pursue my studies and my dreams of becoming a pediatrician."  *Id.* "Because I learned from my father that good study habits and good grades are important, I was a

successful student who got into University of Massachusetts Boston with a partial scholarship. Unfortunately, the stress placed on my family as a result of this federal matter caused my grades to suffer during the first years of college." *Id.* There is a real concern that Kiran would need to leave school, and even that the family would need to move to Pakistan, if Mr. Din went to prison and was unable to support them. *Id.* This would be a great step backwards in their lives, and even dangerous. *Id.* Photographs near Kiran's high school graduation show Mr. Din support for his children's education and well-being. *See* Graduation photographs, attached at Ex. B.

<u>*Mr. Din's Sick Youngest Child*</u>

In January 2010, Mr. Din's youngest child, N.D., was born premature at twenty-six weeks and spent his first 100 days in a hospital. *See id.* at ¶79. This was an especially trying time for Mr. Din and Shazia, particularly given the loss of their first two newborn children. *Id.* at ¶¶78-79. Photographs of the infant show him small, fragile, and intubated. *See* Photographs of N.D. as infant, attached at Ex. C. Mr. Din understandably spent significant time with his family rather than working at restaurants in this period. Mr. Din's daughter Kiran writes, "[w]hen my youngest brother [N.D] was born three months premature, and was hospitalized[,] my parents lived at the hospital and left me to care for two of my younger siblings. My mother couldn't leave the hospital during this time so my father stayed with her but constantly checked up on" the children. *Id.* "He cooked, shopped, and periodically supervised us while spending every other moment at the hospital with my mother and newborn [N.D.]." *Id.*

Today, N.D. suffers from significant health problems, including "refractory epilepsy with focal seizures that consist of behavioral arrest, staring and unresponsiveness, recurrent vomiting with risk for aspiration, and sustained eye deviation." *See* Neurology Visit Final Report, Jurriaan Peters, M.D., Boston Children's Hospital ("BCH"), dated August 14, 2019, filed <u>under seal</u> at

4

Ex. D.   Recurrent epilepsy "means that medicines don't work well, or at all, to control the seizures."  *See* https://www.hopkinsmedicine.org/health/conditions-and-diseases/epilepsy/refractory-epilepsy (last accessed October 29, 2019).  In N.D.'s case, "[h]e responds to intervention with benzodiazepines, but repeated rounds of benzodiazepines have resulted at least 3 times in significant apnea, require first bag mask ventilation, and subsequent intubation."  *Id.*  According to Dr. Peters at BCH, "[t]he duration of seizures has lasted up to 25 minutes . . . [and] qualifies for status epilepticus."  *Id.*  Further, N.D. "has developmental delays, which are global, and well-documented in his IEP."  *Id.*  "His MRIs showed mild ventricular enlargement, nonspecific, and prior EEGs have shown . . . some focal slowing in the right hemisphere, most prominent in the right temporal lobe, or in the right posterior quadrants."  *Id.*  Photographs show N.D. during testing for seizure activity.  *See* Photographs of N.D. at hospital during testing, attached at Ex. E.

While visiting BCH outpatient laboratory on August 6, 2019 (just days after the trial), Mr. Din was with N.D. in the waiting room when N.D. "became unresponsive, had sustained eye deviation to either left or right, and had decreased tome [sic] and was slumping.  After several minutes, [Mr. Din] warned staff, and a code blue was called" to treat the seizure.  *See* Ex. D.

Mr. Din recently informed doctors that N.D "continues to be very anxious, and it is getting worse.  He refuses to leave the house, does not want to sleep alone . . . He may get agitated, and that leads to either self-directed aggression or physical aggression towards others, including biting, and pulling the ear.  Afterwards, he is apologetic."  *Id.*  Importantly, N.D. "needs adult supervision for sustained play with peers."  *Id.*  N.D. also experiences "'selective mutism' . . . and needs to feel comfortable before he uses language."  *Id.*

The present case has already impacted N.D.'s health, and the prospect of sending Mr. Din

to prison risks it further.  Mr. Din's daughter Kiran writes that during this case, "my entire family has been in what I can only describe as a painful limbo."  *See* Letter of Kiran Din at Ex. A.  "I've watched my dad go from being a happy, generous, loving family man to a[n] overly burdened and worried person.  For example, my brother [N.D.'s] seizures are triggered when [N.D.] is stressed and when he doesn't see my father for an extended period of time."  *Id.*  "My father is close to all of us but especially [N.D.].  I see the burden on my father's face as he realizes the uncertainty of  possibly not being in [N.D.'s]  life every day, and the ramifications to [N.D.'s] seizure disorder."  *Id.*

Robin Cross, a retired Massachusetts and Rhode Island attorney, is a neighbor of Mr. Din and has known his family for eleven years.  *See* Letter of Robin Cross, attached at Ex. A.   Ms. Cross notes the Dins "live very humble and frugal lives," and they "show up for their four children in every conceivable way."  *Id.*  Ms. Cross has first-hand knowledge of N.D.'s "seizure illness," "nonverbal" disability, and "learning as well as behavioral challenges."  *Id.*  She writes, "[o]ne need not spend much time in their presence to know that these two [Mr. Din and N.D.] share a special and unique bond.  I fear that if Mr. Din does not continue to remain a daily presence in his youngest son's life, it will take an enormous emotional and developmental toll on [N.D.]."  *Id.*

### *Mr. Din's Community Service and Commitment to Others*

Mr. Din is a longstanding member of the Allston Brighton Islamic Center where he has volunteered for many years.  PSR ¶84.  In a letter to the Court, the Vice-President of the Islamic Center, Bakhtawar Khan, speaks to Mr. Din's personal character and contributions to that community.  *See* Allston Brighton Islamic Center letter, attached at Ex. A.  Mr. Khan writes, "Burhan Din has been with our community since 2001" and "belongs to a very kind, loving, and

supportive family." Mr. Khan notes that Mr. Din's young children are "unable to take on many responsibilities. One of his children has a disability that requires assistance in taking care of his daily life." *Id.*

Mr. Din has invested significant time and work into the community. When the new location for the center opened in 2014-2015 in need of significant repairs, Mr. Din "willingly volunteered and sacrificed his time and energy to make it happen." *Id.* The center documented the work of Mr. Din and others in photographs. *See* Photographs of Islamic Center, attached at Ex. F. According to his friend of twenty years, Iqbal Khan, Mr. Din volunteered to help build the center "so the members of the community could join together in peace and prayer." *See* Letter of Iqbal Khan, attached at Ex. A. For this hearing, one hundred and fifty-seven members of the community have attested to Mr. Din's character and his contributions to the center, as well as the significant loss the center would suffer if he was incarcerated. *See* Allston Community Attestation, attached at Ex. A.

Mr. Din community service is often focused on helping vulnerable people and promoting peace. Back in Pakistan, Mr. Din assisted Zia Ud Din, the former Chairman of Human Rights Committee in the Swat District, to prepare a report on "Violence Against Women in District Swat," published by UNICEF. *See* Letter of Zia Ud Din, attached at Ex. A. Here in the U.S., Mr. Din has visited the sick, elderly, and lonely at hospitals. *See e.g.* Photograph of Hospital Visit, attached at Ex. G. His friend, Mufti Akhar Jan, describes Mr. Din's "struggle for humanity, for the poor and the needy." *See* Letter of Mufti Akhtar Jan, attached at Ex. A. Mr. Din recently gathered in a cross-cultural setting to promote peace between Pakistan and India, two countries with a history of tension. *See* Photos from Peace Gathering, attached at Ex. G.

Mr. Din maintains a strong friendship with Ziauddin Yousafzai, as well as his daughter,

Malala Yousafzai.  See Letter of Ziauddin Yousafzai and Letter of Malala Yousafzai, attached at

Ex. A.   In 2014, Malala was co-recipient of the Nobel Peace Prize for her efforts to provide

Pakistani girls a quality education despite oppression of girls in that country.  *See e.g.*

https://www.nobelprize.org/prizes/peace/2014/yousafzai/biographical/ (last accessed October 31,

2019).  Malala's activism had resulted in her being shot by those opposing her reform efforts.  *Id.*

Since her recovery, Malala and her father started an organization that advocates for girl's and

children's rights throughout the world.  *Id.*  Malala writes that Mr. Din "is a longtime friend of

my father" who has always "considered him to be an honest and trustworthy individual," a

"hardworking person and a loyal friend."  *See* Letter of Malala Yousafzai, at Ex. A.  Malala

fondly recalls her recent visit to the Din home with her father.  *Id.*; *see also* Photographs of

Ziauddin and Malala Yousafzai visit to Din family, attached at Ex. H.

In his letter to the Court, Ziauddin Yousafzai writes, "[W]hen I faced the troubled time

with Malala's case, so many people turned up against me.  Just a handful of friends stood by my

side and Burhan Din was amongst them."  *See* Letter of Ziauddin Yousafzai.  Mr. Din was "able

to inspire me and give me the impression that I am not alone."  *Id.*

Many others from outside the Pakistani-American community know Mr. Din's character

and have experienced his support.  Mr. Din's neighbor Robin Cross writes, "[T]he Dins are kind,

generous, humble, and helpful neighbors."  *See* Letter of Robin Cross, at Ex. A.  In their shared

building, Mr. Din "generously donates his time by helping with repairs both large and small."

*Id.*  After Ms. Cross was recently diagnosed with cancer and had to undergo multiple surgeries,

"[t]he Dins treated me like family in the truest sense of the word . . . [t]he entire family helped

see me through this health crisis.  They became my close and dear friends along the way."  *Id.*

Ms. Cross recognizes that Mr. Din's kind and humble character endured despite financial

difficulties. She writes, "I have never observed the Dins to live lives of financial means in all the years I have known them." *Id.*

Rebecca Jacobstein lived next door to Mr. Din and his family for over seven years, and their respective children are friends. *See* Letter of Rebecca Jacobstein, attached at Ex. A.  Ms. Jacobstein writes, "I rarely saw Mr. Din without his children," and describes the joy his children take in their father. *Id.*  Ms. Jacobstein writes, "I am aware of the charges against him.  But taking him away from his children will be traumatic for them." *Id.*

Charles Breitrose and Jennifer Kavanaugh were longtime neighbors with Mr. Din and his family. *See* Letter of Charles Breitrose and Jennifer Kavanaugh, attached at Ex. A.  The couple writes, "the Dins were always model residents," and describing Mr. Din as hard working and devoted "to his wife, Shazia, and their four children." *Id.*  Familiar with N.D.'s epilepsy and seizures, the couple writes, "Shazia provides fulltime care for their son, [N.D.], who has significant developmental challenges." *Id.*  The couple expresses the common concern that "if [Mr. Din] is unable to work, it is not clear who will provide for the family." *Id.*  Other supporters have submitted letters to the Court, regularly commenting on N.D.'s dependence on his father. *See* Letters of Support, at Ex. A.

### *Advisory Sentencing Guidelines*

#### *Offense Level Computation*

The guideline for 26 U.S.C. § 7202 is found in USSG §2T1.6.  That section provides that the base offense level is the level from USSG §2T4.1(Tax Table) corresponding to the tax not collected or accounted for and paid over.  The total offense level in this case is fourteen, not sixteen as asserted by the PSR and the government, who wrongly contend that the total loss figure is $212,224.01.  At best, the total loss figure is $86,037.82, though as explained *infra,* the

true loss figure is almost assuredly less.

1. The Plea Agreement

On April 21, 2017, the government, predecessor counsel for Mr. Din (Sam Zaganjori, Esq.), and Mr. Din all signed a Plea Agreement letter dated April 12, 2017. *See* "Plea Agreement," attached at Ex. I. The Plea Agreement concerned a prospective guilty plea to the original Information charging Mr. Din with one count of Conspiracy, 18 U.S.C. § 371. *See* Dkt. 1. The Information concerned Mr. Din's role at the same two stores at issue in the Second Superseding Indictment presently before the Court, *viz.*, Crown Fried Chicken at 895 Broadway, Chelsea MA ("Chelsea store") and 1041 Tremont Street, Boston, MA ("Boston store"). *See* Dkt. 67. The Plea Agreement contains the following provision:

> *The parties agree that Defendant's total offense level under the USSG (prior to any adjustment for acceptance of responsibility) is calculated as follows:*
>
> • *in accordance with USSG §§ 2T1.1, 2T1.9 and 2T4.1, Defendant's offense level for conspiracy, in violation of 18 U.S.C. § 271, is 14 because the tax loss is more than $40,000 and not more than $100,000.*

See Ex. I (emphasis supplied). In April 2017, therefore, the government agreed that the tax losses were between $40,000 and $100,000, making their current claim of $212,224.01 more than $100,000 higher than the agreed-to calculations they were ready to submit to the Court in 2017. *Id.*

The defense acknowledges that the Plea Agreement was never filed. Further, the Plea Agreement does not appear to contemplate the alleged tax losses from 377 Centre Street, Jamaica Plain, MA ("Jamaica Plain store").[1] Nonetheless, the government offers no adequate

---

[1] The defense independently objects to the PSR's inclusion of losses from the Jamaica Plain store. *See* PSR Objection #2. Further, even the PSR's estimated of tax losses from the Jamaica Plain store, $25,945.92, is only ~12% of the $212,224.01 of total tax losses claimed by the PSR, and does not come close to accounting for the government's dramatic increase in claimed losses. Moreover, as noted *supra*, even inclusion of actual losses from

explanation for its subsequent claim to $212,224.01 in losses, an increase by at least $112,224.01

(the difference between $212,224.01 and $100,000) and as much as $172,224.01 (the difference

between $212,224.01 and $40,000).  As noted below, the government's *post hoc* calculations are

incorrect, and the defense objects to the government and PSR's unjustified increase in losses,

base offense level, and restitution.

2.  The Spreadsheet

On request, the government provided the defense with a twelve-page spreadsheet

showing how their tax loss estimate provided for the PSR was calculated.  *See* Spreadsheet,

attached at Ex. J.[2]  The Spreadsheet significantly miscalculates and overestimates the total tax

losses in several respects, and the defense objects to these miscalculations and overestimates.

a.  Internal Revenue Manual

First, the Spreadsheet erroneously relies on the "Internal Revenue Manual" ("the

Manual" or "IRM") which, given their present loss estimates, the government could not have

relied on in the Plea Agreement.  *See e.g.* Spreadsheet at 4, 8, and 12.  In *United States v. Horne*,

714 F.2d 206, 207 (1st Cir. 1983), the First Circuit held, "the purpose [of the Manual] is to

govern the internal affairs of the Internal Revenue Service.  ***They do not have the force and***

***effect of law."***  *Id.*, quoting *Einhorn v. Dewitt*, 618 F.2d 347, 350 (5th Cir. 1980) (internal

quotations omitted) (emphasis supplied).  The Court in *Horne* further held, ***"[t]he provisions in***

***the Manual are not codified in the Code of Federal Regulations.  Even if they were codified,***

---

the Jamaica Plain store (i.e., non-IRM claimed losses) would still render total losses at under $100,000 for a base
offense level of fourteen.

[2] The Spreadsheet is marked "draft."  The government indicates the Spreadsheet would be updated in the event of
any revisions before the sentencing hearing; to date, no revisions have been made.  Further, the original twelve-page
Spreadsheet provided by the government was not paginated.  For ease of reference, the defense has added page
numbers to the bottom right-hand of each page of the Spreadsheet.  Should the Court wish to view the original
Spreadsheet without the pagination, a copy has already been provided to Probation and counsel will independently
provide it on request.

**the provisions would not be 'mandatory.'"**  714 F.2d 206, 207 (1st Cir. 1983) (emphasis supplied), citing *Rosenberg v. Commissioner*, 450 F.2d 529, 532-33 (10th Cir. 1971); *Luhring v. Glotzbach*, 304 F.2d 560, 564-65 (4th Cir. 1962); *see also First Federal Sav. & Loan Asso. V. Goldman*, 644 F. Supp. 101 (W.D. Pa.) ("The procedures set forth in the IRM do not have the effect of a rule of law and, therefore, are not binding on the IRS.  The manual is not promulgated pursuant to any mandate or delegation of authority by Congress…").

The erroneous use of the IRM in the Spreadsheet, to which the defendant objects, significantly inflates the tax loss estimates, and on its own accounts for the six-figure difference between the Plea Agreement's loss calculations and those in the PSR.

>    b.  *The IRM's "Federal Income Tax Withholdings (25% of Wages)"*

For instance, the Spreadsheet erroneously uses the IRM to assess a remarkable "withholding" on 25% of wages at all three stores, adding an extra $126,186.19 to the government and PSR's claimed tax losses.  The Spreadsheet assesses these consequential "withholdings," or penalties, against Mr. Din even though the IRM lacks the force and effect of law; the "withholdings" fall outside the Social Security and Medicare taxes that Mr. Din was actually charged with failing to collect to pay over; the "withholding" penalty is a remedy to be pursued, if at all, in a separate civil cause of action; and the very terms of the IRM fail to sustain the claimed 25% "withholding."

The government and PSR's erroneous inclusion of the IRM's "Federal Income Tax Withholdings (25% of Wages)" occurs at every store.  On page 4 of the Spreadsheet entitled "Chelsea Store (895 Broadway) Computation of Payroll Taxes Due and Owing," the government claims a remarkable $38,358.61 in "Federal Income Tax Withholdings (25% of wages)," as seen below:

***Erroneously Claimed "Federal Income Tax Withholdings (25% of Wages)" from the Chelsea Store (From Page 4 of Spreadsheet)***

| | | |
|---|---|---|
| **Q4** | **2008** | **$7,165.42** |
| **Q1 and Q2** | **2009** | **$13,365.94** |
| **Q3 and Q4** | **2009** | **$11,927.00** |
| **Q1** | **2010** | **+ $5,9000.25** |

**Total:**                **$38,358.61**

On page 8 of the Spreadsheet entitled "Boston Store (1041 Tremont) Computation of Payroll Taxes Due and Owing – Store 1041," the government claims an even greater figure of $71,267.58 of "Federal Income Tax Withholdings (25% of wages)," as seen below:

***Erroneously Claimed "Federal Income Tax Withholdings (25% of Wages)" from the Boston Store (From Page 8 of Spreadsheet)***

| | |
|---|---|
| **2009** | **$16,310.49** |
| **2010** | **$13,765.49** |
| **2011** | **$11,097.83** |
| **2012** | **$19,528.85** |
| **2013** | **+ $10,564.92** |

**Total**                **$71,267.58**

On page 12 of the Spreadsheet entitled "Jamaica Plain Store (377 Centre Street) Computation of Payroll Taxes Due and Owing," the government claims another $16,560.00, as seen below:

***Erroneously Claimed "Federal Income Tax Withholdings (25% of Wages)" from the Jamaica Plain Store (From Page 12 of Spreadsheet)***

| | |
|---|---|
| **2010** | **$4,680.00** |
| **2011** | **$4,680.00** |
| **2012** | **$4,680.00** |
| **1/1/2013-7/17/2013** | **+ $2,520.00** |

**Total**                **$16,560.00**

The Spreadsheet's total claimed "Federal Income Tax Withholdings (25% of Wages)" from the three stores is a remarkable $126,186.19, calculated as follows:

**Total Erroneously Claimed "Federal Income Tax Withholdings (25% of Wages)" from Chelsea, Boston, and Jamaica Plain Stores**

| | |
|---|---|
| **Chelsea** | **$38,358.61** |
| **Boston** | **$71,267.58** |
| **Jamaica Plain** | **+ $16,560.00** |
| **Total** | **$126,186.19** |

This total figure of 126,186.19 is revealing.  When subtracted from the PSR's claimed $212,224.01 in losses, the sum is $86,037.82, a figure which falls *squarely inside* the government's original calculation of losses from the April 2017 Plea Agreement, *viz.* "more than $40,000 and not more than $100,000."   This calculation is found below:

**Difference between PSR's claimed payroll tax losses and erroneously employed "Federal Income Tax Withholdings (25% of Wages)" from the IRM**

| | |
|---|---|
| **PSR's claimed total tax losses (payroll and corporate)** | **$212,224.01** |
| **IRM "withholdings" of 3 stores** | **- $126,186.19** |
| **Total** | **$86,037.82** |

Confronted with the First Circuit's clear holding that the IRM does "not have the force and effect of law," *Horne*, 714 F.2d at 207*,* the government argues that *Horne* only precluded a *defendant* from claiming "that he was harmed when the IRS did not act in accordance with its manual but the provision in the manual wasn't mandated by law or regulation," but that the government could rely on the IRM here.  *See* PSR at *37 ("Probation Officer's Response").  This position is wrong on numerous counts.  First, the *Horne* Court (of which U.S. Supreme Court Justice Breyer was a member) did not make any such limitation to defendants.  *Id*.  Second, in this case the claimed withholding is, if anything, a civil penalty that the IRS can seek to enforce

in a civil court, not a criminal trial.  In other words, if the IRS seeks to enforce the claimed IRM

penalty, it can bring a separate civil cause of action against Mr. Din.  Third, where the pertinent

question here is relevant losses and the corresponding base offense level, it is inappropriate to

assess large penalties in calculating that figure, particularly where the penalty would increase the

base offense level.  Indeed, the government's initial loss calculation of $40,000 to $100,000 from

the Plea Agreement suggests that even they found the penalty inapplicable just recently.

Further, even under the government's view of the IRM's applicability, their claimed

"withholding" fails to account for a number of important variables, such as deductions (e.g.,

number of dependents) and whether the employee was filing jointly with a spouse, that would

almost assuredly reduce their figures.

However, the government is not right about the applicability of the IRM, and their

dramatic increase in calculated losses for guidelines purposes must not be premised on an

assessment of a civil penalty.  For all the reasons stated, the Court must reject the government's

increase in loss estimates based on the IRM.

> c. *By its own terms, the Spreadsheet's citation to the IRM's "Federal Income Tax Withholdings (25% of Wages)"applies to Supplementary Wages.  However, there are no Supplementary Wages at Issue in This Case, and Any Imposition of the "Supplementary Rate" on Regular Wages Reveals the Remedial Nature of the Penalty.*

As noted, the IRM does "not have the force and effect of law" and any claim to the

penalty must be brought in a separate civil action.  *Horne*, 714 F.2d at 207.  Even more, a review

of IRM 4.23.8.4, which is cited by the Spreadsheet, shows that the "Federal Income Tax

Withholdings (25% of Wages)" claimed by the government generally relates to Treas. Reg.

31.3402(g)-1 concerning "supplementary wages."   None of the wages at issue in this case,

however, are "supplementary wages."

Treas. Reg. 31.3402(g)-1(a) draws a distinction between "supplementary wages" and "regular wages:"

*(1) Determination of supplemental wages and regular wages.*

(i) Supplemental wages. An employee's remuneration may consist of regular wages and supplemental wages. Supplemental wages are all wages paid by an employer that are not regular wages. Supplemental wages include wage payments made without regard to an employee's payroll period, but also may include payments made for a payroll period. Examples of wage payments that are included in supplemental wages include reported tips (except as provided in paragraph (a)(1)(v) of this section), overtime pay (except as provided in paragraph (a)(1)(iv) of this section), bonuses, back pay, commissions, wages paid under reimbursement or other expense allowance arrangements, nonqualified deferred compensation includible in wages, wages paid as noncash fringe benefits, sick pay paid by a third party as an agent of the employer, amounts that are includible in gross income under section 409A, income recognized on the exercise of a nonstatutory stock option, wages from imputed income for health coverage for a non-dependent, and wage income recognized on the lapse of a restriction on restricted property transferred from an employer to an employee. Amounts that are described as supplemental wages in this definition are supplemental wages regardless of whether the employer has paid the employee any regular wages during either the calendar year of the payment or any prior calendar year. Thus, for example, if the only wages that an employer has ever paid an employee are payments of noncash fringe benefits and income recognized on the exercise of a nonstatutory stock option, such payments are classified as supplemental wages.

(ii) Regular wages. As distinguished from supplemental wages, regular wages are amounts that are paid at a regular hourly, daily, or similar periodic rate (and not an overtime rate) for the current payroll period or at a predetermined fixed determinable amount for the current payroll period. Thus, among other things, wages that vary from payroll period to payroll period (such as commissions, reported tips, bonuses, or overtime pay) are not regular wages, except that an employer may treat tips as regular wages under paragraph (a)(1)(v) of this section and an employer may treat overtime pay as regular wages under paragraph (a)(1)(iv) of this section.

*See* Treas. Reg. 31.3402(g)-1.

The government derived the Spreadsheet's wage figures in large measure from notebooks it argues contains the restaurant's weekly revenue and expenses, as well as the testimony of

16

witnesses concerning their regular hourly wages.  *See* PSR ¶¶35-36, 41, 47, 50.  The government

has argued for the accuracy of the notebooks, and that it was the "regular practice… to make the

records contained in the Accounting Notebooks; and the notebooks were kept in the course of

regularly conducted business activities.  *See* Dkt. 112 at 4.  Assuming *arguendo* the notebooks

did reflect "regular practices" and "regularly conducted business activities," including the

recording of weekly pay for hourly work, it follows that the wages contained therein are "regular

wages [that] are amounts that are paid at a regular hourly, daily, or similar periodic rate (and not

an overtime rate) for the current payroll period or at a predetermined fixed determinable amount

for the current payroll period," as defined by Treas. Reg. 31.3402(g)-1.

      In its response to defendant's objection, the government contends,

> [T]he tax tables the government submitted refer to Internal Revenue Manual §
> 4.23.8.8. It provides the following:
>
> (1) [Internal Revenue Code] 3402 [that is, 26 U.S.C. § 3402] requires employers
> to deduct and withhold income tax from payments of wages. When income tax
> withholding is involved and IRC 3509 [26 U.S.C. § 3509] is not applicable, use
> the supplemental wage withholding rates. See IRM 4.23.8.4, IRC 3402(d) - Relief
> for Employer When Employees Have Paid Income Tax on Wages.
> This applies here, because the 25% rate is being applied to income tax
> withholding. IRC 3509 does not apply, because IRC 3509(c) [26 U.S.C. §
> 3509(c)] says that the "section shall not apply to the determination of the
> employer's liability for tax . . .if such liability is due to the employer's intentional
> disregard of the requirement to deduct and withhold such tax."

*See* PSR at *37 ("Probation Officer's Response").  The government's reliance on this provision

undermines its more central claims because the applicability of the IRM because it reveals, yet

again, that the 25% withholding is a penalty, or remedy, that turns on the type of intent exhibited

by the individual at or around the time of non-collection.  The advisory sentencing guidelines,

however, are concerned with actual losses, not remedial measures that may or may not be sought

by the IRS in a civil action.  The Court must exclude the $126,186.19 in "withholdings" from its

determination of losses under the advisory sentencing guidelines, the base offense level, and restitution.  Such exclusion would leave a loss and restitution figure of $86,037.82, and a base offense level of fourteen.

         d.   The Spreadsheet holds Mr. Din responsible for alleged losses for periods of time outside the Second Superseding Indictment.

Counts two through seven of the Superseding Indictment set forth the periods of times Mr. Din was convicted under 26 U.S.C. § 2702.  As to the Chelsea Store, Mr. Din was charged with two counts: the quarter ending March 31, 2010 (count two) and the quarter ending June 30, 2010 (count four).  As to the Boston store, Mr. Din was charged with four counts: the quarter ending March 31, 2010 (count three), the quarter ending June 30, 2010 (count five), the quarter ending September 30, 2010 (count six), and the quarter ending December 31, 2010 (count seven).

Every quarter charged in the Superseding Indictment occurred in the year 2010.   The PSR and the Spreadsheet, however, attempt to hold Mr. Din responsible for a much longer period from the fourth quarter of 2008 through July 17, 2013.  *See e.g.* PSR ¶49.  The defense objects to Mr. Din being held responsible for any quarter of claimed losses for which he was not indicted and convicted.

This is of particular concern regarding the Boston store.  For example, the evidence concerning Mr. Din's "ownership" of the Boston store at any point is far from established.  *See e.g.* PSR ¶38 (the period Mr. Din allegedly co-owned the Boston store is "unknown").  Mr. Din even stopped regular work at the Boston store in the Fall of 2010.  *Id.* at ¶40.  Notably, Mr. Din's premature son N.D. was born in 2010.  *See* Ex. D.  Crucially, even the PSR admits that Mr. Din's signature appears on 941 tax forms in 2009 and 2010, not other periods.  *Id.* at ¶42.  Mr. Din

must not be held responsible for at least the 2011, 2012, and 2013 periods that fall outside the indictment.

       e.  <u>The Spreadsheet Overestimates the Tax Losses Through its Use of Estimates and Averages</u>

The government's Spreadsheet demonstrably overestimates the tax losses through its use of estimates and averages; worse still, these averages are taken from periods not even charged in the indictment and when Mr. Din did not work at the Boston store or sign their 941 forms.  *Id*. at ¶40.

*Chelsea Store*

In order to estimate gross receipts and wages at the Chelsea Store, the Spreadsheet looks at the accounting notebook for the third quarter of 2008 through the fourth quarter of 2009 and identified this period as 549 days.[3]  The Spreadsheet then takes the daily average of these amounts to determine the fourth quarter for the year 2008 and the first two quarters of 2009.  For example, using these 549 days, the Spreadsheet posits daily "average" wages of $311.54.

A review of the figures however, reveals that the quarterly "estimates" based on this "average" are always higher than the "actual" figures from the accounting notebooks.  For example, on page 4 of the Spreadsheet entitled "Chelsea Store (895) Broadway Computation of Payroll and Taxes Due and Owing," the "estimate" of actual wages from the first two quarters of 2009 ($56,388.74), is greater than the "actual" wages of the last two quarters of 2009 ($53,783.00).  Further, the fourth quarter 2008 "estimate" ($28,661.68) is higher than the "actual" first quarter of 2010 ($26,526.00).  The wage "estimates" are always higher than the "actual" figures.

---

[3] *See* Spreadsheet at page 3 entitled "Chelsea Store (895 Broadway) Computation of Estimated Daily Gross Receipts, non-Wage Expenses and Wages Using Notebooks (Q3 2009 through Q4 2010)."

These disparities between the "estimates" and "actual" figures are suggestive of a seasonality (or some other variable resulting in higher figures) during the 549 days chosen by the government that has been used to create an "average" that is higher than the actual figures from other quarters.  In sum, the Court should not accept "averages" that are higher than "actual" figures provided.  At a minimum, the Court should round down to the "estimates" to the "actual" figures available.

*Boston Store*

The government unduly relies on "estimates" at the Boston store as well, and more egregiously.[4]  Here, the government used just 129 days from 03/11/13 to 07/17/13 to create a "daily average" of gross receipts, non-wage expenses, and wages, and then used that figure retrospectively to create "estimates" from 2009, 2010, 2011, 2012, and part of 2013.  In other words, the "estimated" figures from a remarkable stretch of more than 4 years are premised on a short stretch of just over 4 months.  Worse still, the 129 days selected are from 2013 when Mr. Din was not even working at the Boston store or signing its 941 forms.

Further, these "estimates" are inappropriate for use in themselves; they assume that the financial circumstances at the restaurants from 2013 reflect the circumstances from preceding years.  But that is an empty assumption.  The government, for example, fails to show that the same number of employees received the same hourly wages in 2013 as in 2009.  Further, the price of a meal at the store is likely to have risen from 2009 to 2013, yet the government assesses the restaurant with the 2013 figures over the entire period between 2009 and 2013.

The Court must not allow the government to select figures advantageous to their position, and unduly extrapolate from those figures to prior and distinct times and circumstances.

---

[4] *See* Spreadsheet at page 7 entitled "Boston Store (1041 Tremont) Computation of Estimated Gross Receipts, Non-Wage Expenses and Wages."

f.  Employees versus Independent Contractors

The government assumes, without sufficient evidence, that every person whose name is featured in a notebook, or who might be mentioned by a witness, is an employee rather than an independent contractor.  While mindful of the jury's verdict, it is not inconsistent with that verdict to find that some of those persons only occasionally appearing in notebooks are independent contractors who worked only as necessary and were responsible for paying their own withholding taxes, including Social Security and Medicare Taxes.  The absence of 1099 forms is hardly dispositive given the absence of many W2 forms.  The government has never set forth its method of determining whether a given individual was an employee rather than independent contractor, and the fluctuating number of workers, and the nature of the work performed, hardly supports a finding that every worker was an employee rather than independent contractor.

3.  The Jamaica Plain Store

The defense objects to the PSR's calculation of losses of the Jamaica Plain store.  *See* PSR at ¶¶18-21, 25, 31-32, 44-45, 47, 49-50, 88; PSR Objection #2.  Mr. Din was neither indicted nor convicted of any charges in connection with the Jamaica Plain store, and the alleged losses are not relevant conduct for purposes of the sentencing guidelines.

*Mr. Din Has No Prior Criminal History*

Mr. Din has no prior criminal history.  *Id.* at ¶¶ 68-69.  Probation provides him with a criminal history score of zero and places him in Criminal History Category I.  *Id*.

*Advisory Sentencing Guidelines Sentence*

With a total offense level of fourteen and a criminal history category of I, Mr. Din's advisory guidelines sentence is fifteen to twenty-one months.

*Restitution*

This case, brought under Title 26, is not part of the Mandatory Victim Restitution Act of 1996 ("MVRA"), Pub. L. No. 104-132, § 204(a), 110 Stat. 1227 (1996) (codified as amended at 18 U.S.C. § 3663A).   If ordered, any restitution must be payable only during a term and as a condition of probation or supervised release.   Further, if ordered, restitution must be joint and several with other defendants, including but not limited to Hazrat Khan and Adalat Khan.

*Sentencing Recommendation*

Mr. Din is a fifty year-old man with no prior criminal record and a family who depends on him financially and emotionally.   While about half of this memorandum concerns loss calculations, Mr. Din's request for probation is less about the applicability of a federal agency's internal manual, and more a reflection of human circumstances.   Mr. Din's son N.D.'s epilepsy and seizures require his constant attention and care.   A term of incarceration will almost assuredly endanger N.D.'s health, both by depriving him of supervision and a means of getting to the hospital in an emergency, and the emotional trauma the already anxious and selectively mute child would surely experience in his father's absence.   Mr. Din's other children will also suffer without his love and financial support, including risking a return to Pakistan, a country the children barely know, and forcing Karin to leave college to help her family.   Simply put, incarcerating Mr. Din in prison would endanger his family's future, perhaps forever.

No doubt, this case is important; but countervailing interests should prevail.   Mr. Din has spent his life loving and supporting his family and working to help others in need.   He is a good and caring person and an example to others.   It might be thought that deterrence is best served by putting someone like Mr. Din in prison.   Just the opposite.   Mr. Din's case has profoundly impacted his community in that sense already.   For those actually watching this trial, for those

that will ever really know about this case, what really can be achieved now is something far deeper and more meaningful.  A lesson about humility, clemency, service, loyalty to country, and earned second-chances.

For the above-stated reasons, Mr. Din respectfully requests the Court adopt his sentencing recommendation.

<div style="margin-left:40%">

Respectfully submitted,
BURHAN UD DIN
By his attorney:

*/s/ David J. Grimaldi*
David J. Grimaldi
David J. Grimaldi, P.C.
BBO No. 669343
675 Massachusetts Avenue, 9th Floor
Cambridge, MA 02139
617-661-1529 (tel)
857-362-7889 (fax)
david@attorneygrimaldi.com
</div>

DATE: November 1, 2019

<div align="center">

## CERTIFICATE OF SERVICE
</div>

I, David J. Grimaldi, hereby certify that true copies of this memorandum were served on all registered participants via CM/ECF this 1st day of November, 2019.

<div style="margin-left:40%">

*/s/ David J. Grimaldi*
David J. Grimaldi
</div>